GENERAL INS. CO. OF AMERICA v.
LINK et al.
No. 12001.

United States Court of Appeals
Ninth Circuit.

April 9, 1949.

Skeel, McKelvy, Henke, Evenson & Uhlmann, Harry Henke, Jr., and Donald S. Voorhees, all of Seattle, Wash., for appellant.

Bogle, Bogle & Gates, Stanley B. Long and Thomas L. Morrow, all of Seattle, Wash., for appellee.

Before: DENMAN, Chief Judge, STEPHENS, Circuit Judge, and YANKWICH, District Judge.

DENMAN, Chief Judge.

This is an appeal from a decree holding appellant liable to appellees on its policy of war risk insurance for damages to appellees' wooden motorship Eastern Prince by collision with the United States Navy Yard oiler Roustabout, a small armed tanker. The collision occurred on May 11, 1942, during the war with Japan.

The Roustabout, in command of a Naval Lieutenant, was engaged in a series of voyages in carrying naval supplies from the Naval Station in Seattle to the Naval Section Base in Sitka, Alaska, traveling in the Inside Passage. On the voyages from Sitka to Seattle she carried cargo consisting of freight offered by the Navy or Coast Guard, empty containers, oil drums, empty acetylene and oxygen tanks, damaged airplane motors, damaged airplanes, trucks and automobiles. At the time of the collision while so enroute to her Seattle station, the Roustabout had aboard water ballast and miscellaneous dry cargo of the nature just above described. Before the collision she had left the Naval Section Base at Sitka enroute to the Seattle Naval station. The voyage was solely for a war purpose in a continuing war service between Seattle and Sitka, serving the resistance to the Japanese attacks on Alaska and her submarines and airplanes.

The Roustabout, when in Seymour Narrows, was on her left or easterly side of the channel, agreed by both parties to be a narrow channel within the meaning of the International Rules, 33 U.S.C. § 110, 33 U.S.C.A. § 110. While wrongly there she saw, also on the easterly side of the channel, the masthead lights, but no running lights, of the Eastern Prince, which the Roustabout thought was a southbound vessel, which, like herself, was on the wrong side of the channel.

Had the Roustabout been on the channel's right side she would have been well to the Eastern Prince's assumed starboard side, and would have safely passed her to her starboard, had she in fact been an overtaken vessel. The Roustabout was mistaken as to the course of the Eastern Prince. The latter was proceeding northerly on her right side of the channel. She was in fault for obscuring her running lights by a projecting deck load of cargo. In the subsequent maneuvers both vessels turned to the easterly and the collision occurred while the

Roustabout was further on the wrongful side of the narrow channel.

The district court properly held that both vessels were in fault. What is here pertinent is that the naval commander's fault in navigating on the wrong side of the channel was a proximate cause thereof, continuing to her impact on the port quarter of the turning Eastern Prince.

Appellees, owners and charterers of the Eastern Prince, sue on a war risk policy rider to an ordinary marine policy providing, "It is agreed that this insurance covers only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty." The policy has the usual clause insuring war risks, the pertinent provisions of its F. C. & S. clause are: "Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage or expense caused by or resulting * * * from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife, arising therefrom." [1]

The district court held that the naval vessel's wrongful navigation was a warlike operation and gave judgment against the General Insurance Company. This appeal followed.

The Supreme Court has had before it no case like the instant appeal. It has held as to merchant vessels under command of civilian officers on voyages carrying soldiers or war supplies between the ports of belligerents that the injuries by collision and stranding are not the result of warlike operations and not covered by an insurance of war risk, Morgan v. United States, 14 Wall. 531, 535, 20 L.Ed. 738, nor by the insurance of risks excluded by the F. C. & S. clause, Queen Ins. Co. of America v. Globe & Rutgers Ins. Co., 263 U.S. 487, 491, 44 S.Ct. 175, 68 L.Ed. 402.

In neither of these cases was the proximate cause, Morgan v. United States, supra, 14 Wall. page 535, and that "nearest to the loss," Queen Ins. Co. of America v. Globe & Rutgers Ins. Co., supra., 263 U.S. page 492, 44 S.Ct. page 176, the wrongful commands of naval officers directing the navigation of an armed naval vessel in a war service. Both cases arguably support the principle that in the instant case the naval vessel's action was a warlike operation within the exclusion of the F. C. & S. clause.

In the absence of any direct Supreme Court authority the principle of following the House of Lords decisions is stated in Queen Ins. Co. of America v. Globe & Rutgers Ins. Co., supra, 263 U.S. page 493, 44 S.Ct. page 176, "There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business." [2]

The facts here are in all relevant respects the same as in the House of Lords decision in Board of Trade v. Hain S. S. Co., Ltd., [1929] A.C. 534. As stated by Lord Buckmaster they are that "at about 8.20 p. m. on December 25, 1918, the steamship Trevanion collided in the North Atlantic with the steamship Roanoke and suffered damage by which she was disabled for ninety-nine days. The Trevanion was at the date

---

[1] At the hearing the appellees stated they had a policy insuring the Eastern Prince against collision not a consequence of warlike operations and as not unusual the litigation is to determine which of two insurers is liable. Furthermore, the case is interesting as one of the last, if not the last, construing the conventional F. C. & S. clause, universally used by insurers since 1883, since both the American and British underwriters have now modified their war liability exclusion clauses to meet the conflicting decisions of the British and American cases.

[2] This harmony with the British law is also stated in the following admiralty opinions of Judges Learned Hand in Aetna Ins. Co. v. United Fruit Co., 2 Cir., 92 F.2d 576, 580; Augustus Hand in Mellon v. Federal Ins. Co., D.C.S.D.N.Y., 14 F.2d 997, 1004; Swan in New York and Oriental S. S. Co. v. Automobile Ins. Co., 2 Cir., 37 F.2d 461, 463, and in The Galileo, 2 Cir., 54 F.2d 913, 915; Foster in Aetna Ins. Co. v. Houston Oil Transport Co., 5 Cir., 49 F.2d 121, 124; and of Justice Stone in Aetna Ins. Co. v. United Fruit Co., 304 U.S. 430, 58 S.Ct. 959, 82 L.Ed. 1443.

of the collision under requisition to His Majesty's Government upon the terms of the charterparty, which under the reference of T.99 has become familiar to the Courts. The Roanoke was in the possession and control of the United States of America and was employed by the United States Navy as a mine planter, officered by officers of the United States Navy and manned by a United States Navy crew. At the time of the collision the Trevanion was on a voyage from New York to Portland laden with a cargo of oats and the Roanoke was proceeding from Portland to Hampton Roads, Virginia, with 720 mines on board belonging to the Navy Department of the United States of America, she was carrying no other cargo and no passengers. The collision was due to the joint negligence of both vessels and both were equally to blame." Board of Trade v. Hain S. S. Co., Ltd., supra, p. 537.

The unanimous court held the loss was from a warlike operation, Lord Buckmaster stating at page 538: "This House has decided that, if a vessel is engaged on warlike operations and none the less by its negligence collides with another vessel, the negligence does not prevent the collision being the result of warlike operations: See Attorney-General v. Adelaide Steamship Co. (The Warilda), [1923] A.C. 292. It is neither necessary nor fitting to discuss or examine the grounds of that judgment, for the law upon this point is authoritative and clear. It follows, therefore, that the negligence of the Roanoke does not prevent this collision from being the result of warlike operations. Does then the negligence of the Trevanion produce that result? In my opinion it does not. I think the case of Reischer v. Borwick, [1894] 2 Q.B. 548, approved by this House in Leyland Shipping Co. v. Norwich Union Fire Insurance Society, [1918] A.C. 350, shows that it is no answer to a claim under a policy that covers one cause of a loss that the loss was also due to another cause that was not so covered. It follows from that that the claim made against the Roanoke, which, if it stood alone, would have been covered by the policy, is not the less covered because the Trevanion also contributed to the accident."

In the Warilda, [1923] A.C. 292, cited above, the collision occurred in the English Channel on March 24, 1918, between the Warilda and the Petingaudet. "The steamship Warilda was requisitioned by the Admiralty on the terms of a charterparty in the form T.99, whereby the Admiralty were not to be responsible for marine risks, but undertook such war risks as would be excluded from an ordinary marine policy by the f. c. and s. warranty, including 'all consequences of hostilities and warlike operations,' and since 1917 she had been employed as an ambulance transport. * * * The Warilda was proceeding from Havre to Southampton with 603 wounded men and a staff of doctors and nurses on board. In accordance with Admiralty instructions she was steaming at top speed and without lights. The Petingaudet was carrying a cargo of coke and was also steaming at high speed with dimmed side lights. Both ships were damaged by the collision." The Warilda, supra [1923] A.C. page 293.

Upon agreement that the Warilda was engaged in a warlike operation, Viscount Cave, L.C., whose opinion is in accord with the other Lords, states [1923] A.C. at page 298: "It was said that the warlike operation of the Warilda was not the proximate cause of the collision, that the negligence of her master was a new factor intervening between the warlike operation and the collision, and that the collision was a consequence of that negligence and not of the warlike operation. The Court of Appeal unanimously rejected this argument, and held the Crown responsible. My Lords, I agree with the view taken by the Court of Appeal. By the terms of the charterparty, the Crown is liable for 'all consequences' of hostilities or warlike operations, nothing being said about their being skillfully or unskillfully conducted. The navigation of the Warilda in those waters at full speed without lights was clearly a warlike operation, which in itself involved peril to other ships. The operation may have been negligently conducted so far as the safety of other vessels was concerned, but the same may be said of many other warlike operations. The negligence of the master may have contributed to the loss; but its dominant and effective cause was the operation in which

the vessel was engaged, and the liability therefor attaches."

We agree with the district court's finding that the Naval vessel, the Roustabout, was negligently navigated by her Naval commander up to the moment of collision and a proximate cause thereof, combined with the fault of the Eastern Prince, and with its conclusion of law that such navigation was a "warlike operation" within that phrase of the policy and that the General Insurance Company is liable for the damage to the Eastern Prince.

The decree is affirmed.