**D.B. ORBAN CANADA, INC., Plaintiff,**

**v.**

**NEW YORK MARINE MANAGERS, INC., Progressive Casualty Insurance Company, Co., Christiania General Insurance Corp. of New York, the Reinsurance Corporation of New York, Worcester Insurance Company, Pennsylvania Lumbermans Mutual Insurance Company, Republic Insurance Company, Colonia Insurance Company —U.S. Branch, United Reinsurance Corporation of New York, and United Fire & Casualty Company, Defendants.**

No. 88 Civ. 5926 (JES).

United States District Court, S.D. New York.

June 4, 1991.

As Amended June 27, 1991.

Donovan, Parry, Walsh & Repetto, New York City (Richard E. Repetto, James P. Krauzlis, of counsel), for plaintiff.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City (Thomas L. Tisdale, of counsel), for defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiff, D.B. Orban Canada, Inc. ("Orban"), brings this action alleging that the

defendant underwriters have failed to pay the full amount due it pursuant to an insurance agreement between the parties. The parties have agreed to a Bench Trial upon stipulated facts. The Court has reviewed the evidence submitted by the parties and has heard Oral Argument. For the reasons that follow, judgment shall be entered for the plaintiff. The following shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R. Civ.P. 52(a).

On or about June 1, 1987, N.Y. Marine Managers, Inc. ("N.Y. Marine"), a marine insurance underwriter, issued Ocean Cargo Policy No. C4785 ("the Policy") to Orban as assured which insured, *inter alia*, shipments of steel coils and bundles of galvanized pipe against all risks of physical loss or damage from any external cause. *See* Stipulation of Agreed Facts ("Stip.") at ¶¶ 14–15 & Ex. 1. The policy was negotiated between Johnson & Higgens ("J & H"), Orban's insurance brokers, and N.Y. Marine, acting with the authority and consent of the defendant underwriters. *See* Stip. at ¶¶ 13–14.

Between June 20, 1987 and July 10, 1987, certain coils of steel sheets and galvanized pipes purchased by Orban and resold to various consignees were loaded aboard the ocean carrier M.V. FAKREDINE at ports in Turkey.[1] *See* Stip. at ¶¶ 20–21. "Clean on Board" ocean bills of lading were issued to the shipper for both the steel sheets and pipes, and negotiated to Orban for value.

*See* Stip. at ¶¶ 20–21 & Exs. 7–8. Thereafter, Orban issued invoices to each of its purchasers covering the sale of the shipment of the steel pipes and coiled sheets showing a total "C & F 'Duty and Wharfage Paid,' ex dock, price of $1,214,864.84." *See* Stip at ¶ 24 & Ex. 11. Unfortunately, the entire shipment was totally lost en route and never arrived at its port of discharge. *See* Stip. at ¶ 28. Both parties agreed that this loss occurred during the Policy's coverage period. *See* Stip. at ¶ 31.

As a result, Orban submitted a claim to J & H on September 11, 1987, who forwarded it to N.Y. Marine on September 18, 1987.[2] That claim, which was supported by Orban's sales invoices and bills of lading sought $1,214,861.94.[3] *See* Stip. at ¶ 32 & Ex. 13. In response to this claim, the defendant underwriters paid Orban $500,000 "on account" on October 19, 1987, *see* Stip. at ¶ 36, and an additional $652,470 on November 9, 1987 resulting in a total payment of $1,152,470. *See* Stip. at ¶ 37.

Since the parties agree that the loss was a covered loss under the policy and N.Y. Marine has already paid most of the amount claimed by Orban, the only issue in dispute is the proper valuation of the goods under the terms of the insurance agreement. The policy was a "value agreed" policy which meant that the insurer would pay a value for the lost goods as calculated under an agreed upon valuation clause.[4]

---

1. The details regarding the terms of the purchase and sales contracts, including the amounts Orban was obligated to pay to its sellers and the amounts due it from its consignees, are set forth in the parties' stipulation and need not be repeated here. *See* Stip. at ¶¶ 16–19, 22–23 & Exs. 2–6, 9–10.

2. In addition, on September 15, 1987, when Orban knew that the ship could not be located, it submitted a declaration of value to J & H, who forwarded it to N.Y. Marine, stating that the shipment value was $1,259,220.16 and paid its premium based upon that value. *See* Stip. at ¶ 25 & Ex. 12. Orban calculated the declared value of the cargo by totalling the supplier's invoices including duty, stevedore costs, wharfage, truck loading, financing and insurance, and by adding an additional fifteen percent to that sum. *See* Stip. at ¶ 26; Deposition of Juergen Schlate ("Schlate Dep.") at 25–26. However,

when it made this declaration, Orban was not aware that the policy terms as to valuation had been changed from fifteen percent contained in the June 1, 1986 policy to twenty percent contained in the January 1, 1987 policy. *See* Stip. at ¶ 38.

3. However, the parties agree that the actual value of the entire shipment as reflected in Orban's sales invoices was $1,214,864.85. *See* Stip. at ¶ 34 & Ex. 11.

4. The valuation clause in this policy provided as follows:
   All goods and merchandise except those specifically provided for elsewhere herein, to be valued:
   A. At amount of invoice, including all charges in the invoice, and including prepaid and/or advanced and/or guaranteed freight, if any, plus Twenty (20%) or

*See Aetna Ins. Co. v. United Fruit Co.,* 304 U.S. 430, 434–35, 58 S.Ct. 959, 960–61, 82 L.Ed. 1443 (1938); *St. Paul Fire & Marine Ins. Co. v. Pure Oil Co.,* 63 F.2d 771, 772 (2nd Cir.1933); *Rosenthal v. Poland,* 337 F.Supp. 1161, 1170 (S.D.N.Y. 1972). *See also* Stip. at Ex. 1, clause 47; Deposition of Richard J. Giordano ("Giordano Dep.") at 12–13. Plaintiff argues that it is entitled to recover the total value of $1,214,864.85, which the parties agree represents the amount of all of its sales invoices for sales to other parties, including all charges therein, pursuant to clause 6(C) of the Policy. Defendant contends that its payment of $1,152,470.00 constitutes a full settlement of the claim pursuant to clause 6(A) because it represents the value per the suppliers' invoices ($960,392.03) plus twenty percent. Thus, defendants refused to pay $62,394.85.

New York Marine makes three arguments in support of its contention that Orban was not entitled to the $62,394.85 difference between its payment and Orban's claim: (1) since Orban initially made its declaration pursuant to a misreading of clause 6(A) of the insurance agreement, it should be held to a valuation pursuant to clause 6(A); (2) if the declaration of value could be construed as a declaration pursuant to clause 6(C) of the contract, it was untimely; and (3) clause 57 of the insurance agreement precluded recovery for charges for duty which were not incurred. The Court finds none of these arguments persuasive.

While it does appear that plaintiff's declaration of the value of the cargo was arguably based upon a misreading of clause 6(A) of the policy, *see* Stip. at Ex. 12; Schlate Dep. at 25–26, there is no basis for defendant's argument that plaintiff must be held to a clause 6(A) valuation. Indeed, the policy expressly provided that an unintentional delay in declaring the value of a shipment or an unintentional error in calulating the value of a shipment would not prejudice the assured so long as prompt notice was given to the assurer once the true facts were known. *See* Stip. Ex. 1 at 11. Since Orban declared a value for the goods in excess of that which it ultimately sought to recover defendant can hardly claim to have been prejudiced by the incorrect declaration. This is especially true since Orban paid a higher premium than it should have paid based upon that excessively high valuation.

Moreover, the assured was clearly entitled to the value set forth in 6(C), which unambiguously states that the assured is entitled to *the value set forth in its invoices, "including all charges in the invoice."* *See* Stip. at ¶ 29 & Ex. 1, at 1. Since clause 6(C) sets forth no exceptions to the type of charges which can be contained in an invoice, defendant's attempt to exclude charges for duty must be rejected. This conclusion is supported by the testimony of Mr. Giordano, a representative of N.Y. Marine who negotiated the Policy with Orban, who stated that the value upon which N.Y. Marine would pay claims was the value of the assured sales invoices without any limitations, as long as the charges were part of the sales costs in the invoice. *See* Giordano Dep. at 15–16.

Moreover, the provision in the valuation clause requiring that duty be declared separately provides no support for an argument that unpaid duty charges were excluded from the charges on a sales invoice under clause 6(C). Although that provision could be read to require that the assured set forth amounts reflecting duty separately under a valuation pursuant to any provision of the valuation clause, the plain language of clause 6(C) allows recovery of all charges contained in a sales invoice without exception. In view of this clear language,

B. At the amount required by instructions received by the Assured or at the amount declared, provided such instructions or declarations are made prior to any known or reported loss or accident, but in no event to be less than the foregoing.

C. Imports Sold by the Assured, prior to arrival of the overseas vessel at port of discharge, and prior to known or reported loss, to be valued at the Assured's sales invoice including all charges in the invoice, but in no event to be less than 6.–A above

*Note:* Duty, if any, to be declared separately. *See* Stip. at ¶ 29 & Exhibit 1, at 2.

any argument that unpaid duty charges cannot be part of a 6(C) valuation because of the requirement that they be reported separately must be rejected. This is especially true since, as the deposition testimony indicates, the only consequence of failure to set forth the duty charges separately is that the assured paid a higher premium than it otherwise would have been required to pay. *See* Giordano Dep. at 21–22. It follows that the defendant was in no way prejudiced by plaintiff's failure to strictly comply with the language of the agreement in that regard.

Nor is there any basis for construing clause 6(C) to require that charges for duty be actually incurred before the insured can recover for those amounts. Clause 6(C) was obviously designed to provide the assured the full benefit of his bargain as reflected in the sales invoices where he has already sold the goods. *See* Deposition of Gerd W. Rosenow ("Rosenow Dep") at 18–20, 47–51. Having agreed to allow the assured to elect to be paid on that basis, it ill behooves the defendant to contend that the assured is receiving a windfall because it did not actually pay any duty on the lost cargo.[5] *See id.* at 53. In sum, the Court must enforce the clear and unambiguous agreement entered into between responsible business entities as written. *See Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 135 (2d Cir.1986); *Ogden Corp. v. Travelers Indemnity Co.,* 681 F.Supp. 169, 173 (S.D.N.Y.1988); *American Home Products Corp. v. Liberty Mutual Ins. Co.,* 565 F.Supp. 1485, 1492 (S.D.

N.Y.1983), *modified on other grounds,* 748 F.2d 760 (2d Cir.1984).

■ Defendants' argument that even if the declaration of the cargo could be construed as a 6(C) declaration, it was untimely because it was made after the loss of the shipment was known by the plaintiff is untenable. The Policy expressly stated that a valuation of the insured goods may be made under Clause 6(C) if the items have been "*sold* by the Assured, prior to arrival of the overseas vessel at the port of discharge, and prior to known or reported loss." Stip. at ¶ 30 & Exhibit 1, at 2 (emphasis added).[6] Since there is no dispute that Orban sold the goods prior to loading them on the ship and prior to its discovery of the loss, *see* Stip. at ¶¶ 17–21, 24–25, the clause 6(C) declaration was timely.

■ Finally, N.Y. Marine contends that an exclusion of unpaid duty as part of the insured value is supported by the language of Clause 57.[7] However, it is well-settled under New York law that an insurer wishing to exclude certain coverage from its policy obligations must do so in clear and unmistakable language, *Seaboard Sur. Co. v. Gillette Co.,* 64 N.Y.2d 304, 310, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984); *see also Board of Education v. CNA Insurance Co.,* 647 F.Supp. 1495, 1503 (S.D.N.Y.1986), *aff'd,* 839 F.2d 14 (2d Cir.1988), and that restrictions on coverage cannot be implied. *National Grange Mutual Insurance Co. v. Continental Casualty Insurance Co.,* 650 F.Supp. 1404, 1408 (S.D.N.Y.1986); *Nipkow & Korbelt,*

---

**5.** The Court therefore rejects the deposition testimony that the charges for duty must have been incurred in order for the insured to recover. *See* Giordano Dep. at 53; Deposition of Henry C. Riviera ("Riviera Dep.") at 40–50. That testimony is not supported by any plausible reading of the valuation clause and the other provisions cited by Messrs. Giordano and Riviera in their testimony are inapposite.

**6.** In contrast, clause 6(B) clearly required that the valuation of the goods take place prior to any known or reported loss, a circumstance which weighs heavily against defendants' claim that the Court should read the same requirement into the dissimilar language of clause 6(C).

**7.** Clause 57 states in relevant part:

This insurance also covers, subject to policy terms of average, the risk of partial loss by reason of perils insured against on the freight payable at port of destination ... and on duties imposed on goods insured hereunder, it being understood and agreed, however, that when the risk upon the goods continues beyond the time of landing from the overseas vessel, the increased value, consequent upon the payment of such freight and/or duties, shall attach as an additional insurance upon the goods from the time such freight and/or duty is paid or becomes due, to the extent of the amounts thereof actually paid or payable.

*Inc. v. North River Ins.,* 633 F.Supp. 437, 439 (S.D.N.Y.1986).

Clause 57 contains no specific requirement that duty be deducted from the insured value in the event of a total loss prior to the goods being landed. In fact, that clause by its terms provides additional coverage for risks of partial loss on freight payable at destination and on duties imposed, with the condition that if the risk of partial loss continues beyond the time of landing of the insured goods at the port of destination, any such "increased value" by reason of paid duty and/or freight attaches as additional insurance. Thus, it is clear that Clause 57 applies only to a situation where the goods are landed and require coverage while enroute to their ultimate destination. It has no applicability to a situation where, as here, the goods are lost at sea. *See* Giordano Dep. at 24–25; Rosenow Dep. at 48–49.

## CONCLUSION

For the foregoing reasons, judgment shall be entered for the plaintiff in an amount equal to $63,394.85 and the amount of $434.70 in overpaid premiums, together with prejudgment interest.[8] Plaintiff is directed to submit an appropriate judgment on notice to the defendant within twenty days of the date of this order.

IT IS SO ORDERED.

---

8. The parties agreed that plaintiff originally declared the value of the shipment to be $1,259,-220.16 and paid a premium of $12,340.37. *See* Stip. at ¶ 25 & Ex. 25. However, the actual value should have been that declared from the sales invoices, $1,214,864.85, and the actual premium should have been $11,905.67. *See* Stip. at ¶ 24 & Ex. 11. Accordingly, plaintiff is entitled to $434.70 in overpaid premiums as well.